IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| EVETTE TANNER, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO. |
| | ) | |
| v. | ) | |
| | ) | |
| PETSMART, INC. | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendant | ) | |

**COMPLAINT**

**COMES NOW** Plaintiff Evette Tanner (hereinafter "Plaintiff" or "Ms. Tanner"), by and through her undersigned counsel, and sets forth this Complaint for Damages against the above named Defendant Petsmart, Inc. (hereinafter "Defendant Employer"). Plaintiff respectfully shows this Court as follows:

**<u>JURISDICTION AND VENUE</u>**

1.

This action is for gender-based discrimination and retaliation arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* (hereinafter "Title VII"), and state tort claims. Plaintiff seeks declaratory and injunctive relief, back pay, front pay, compensatory damages, punitive damages and attorney's fees and costs. The claims herein present a federal question thus

1

jurisdiction is proper before this Court pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343. Plaintiff further invokes pendant jurisdiction of this Court pursuant to 28 U.S.C. § 1367 to hear and decide claims arising under the laws of the State of Georgia for sexual assault, battery, negligent retention, and negligent supervision.

2.

All parties to this action reside or are located within the boundaries of this judicial district, and venue is proper pursuant to, inter alia, 28 U.S.C. § 1391(b)(2). Moreover, the unlawful employment practices alleged below were committed within the geographic boundaries of the Atlanta Division, Northern District of the United States District Court, of the State of Georgia.

**<u>PARTIES</u>**

3.

Defendant Employer is a for-profit foreign corporation organized under the laws of the State of Delaware, registered to conduct business in the State of Georgia, and subject to the jurisdiction of this Court.

4.

Defendant Employer may be served through its Registered Agent: Corporation Process Company, 289 S. Culver St. Lawrenceville, GA 30046-4805, if service of process is not waived.

5.

Plaintiff is a female citizen of the United States residing in Georgia and a member of a protected class under Title VII.

**FACTS**

6.

Defendant Employer employed fifteen or more employees for each working day in each of twenty or more calendar weeks during Ms. Tanner's employment from July 2014 through June 2016.

7.

Defendant Employer is subject to the anti-discrimination and anti-retaliation provisions of Title VII.

8.

Defendant Employer owns and operates multiple locations of Petsmart, a pet supply store chain located throughout the United States.

9.

In or around July 2014, Ms. Tanner began her employment with Defendant Employer as a Distribution Center Rack Associate ("Associate") in a warehouse distribution center and would pull inbound and outbound orders for shipment to stores and clients.

3

10.

Shortly after starting, Ms. Tanner began to be sexually harassed by Darius Allen, Bernard Carter, Terry Cook, Frank Hailstork, Kevin Chancey, and Michael Byrd (the "Harassers").

11.

Mr. Allen was an Associate and beginning in or around September 2014, he began making sexually offensive comments to Ms. Tanner.

12.

Ms. Tanner repeatedly told Mr. Allen the sexual advances and harassment were unwelcomed and unwanted, yet Mr. Allen continued to make lewd comments to Ms. Tanner on a near daily basis.

13.

Ms. Tanner reported Mr. Allen's behavior to her trainer, Rodney Godfrey, and the Distribution Center Rack Associate Manager, Jonathan Loving, her direct supervisor.

14.

Despite Ms. Tanner's complaint, there was no follow up and nothing was done to prevent Mr. Allen from sexually harassing Ms. Tanner at work.

15.

Mr. Carter was an Associate and beginning in or around September 2014, he began making sexually offensive comments to Ms. Tanner.

16.

Ms. Tanner repeatedly told Mr. Carter the sexual advances and harassment were unwelcomed and unwanted, yet Mr. Carter continued to make lewd comments to Ms. Tanner on a near daily basis.

17.

Ms. Tanner reported Mr. Carter's behavior to Mr. Godfrey, and Mr. Loving.

18.

Despite Ms. Tanner's complaint, there was no follow up and nothing was done to prevent Mr. Carter from sexually harassing Ms. Tanner at work.

19.

Mr. Cook was an Associate and beginning in or around September 2014, he began making sexually offensive comments to Ms. Tanner.

20.

Ms. Tanner repeatedly told Mr. Cook the sexual advances and harassment were unwelcomed and unwanted, yet Mr. Cook continued to make lewd comments to Ms. Tanner on a near daily basis.

21.

Ms. Tanner reported Mr. Cook's behavior to Mr. Godfrey, and Mr. Loving.

22.

Despite Ms. Tanner's complaint, there was no follow up and nothing was done to prevent Mr. Cook from sexually harassing Ms. Tanner at work.

23.

Mr. Hailstork was an Associate and beginning in or around September 2014, he began making sexually offensive comments to Ms. Tanner.

24.

Ms. Tanner repeatedly told Mr. Hailstork the sexual advances and harassment were unwelcomed and unwanted, yet Mr. Hailstork continued to make lewd comments to Ms. Tanner on a near daily basis.

25.

Ms. Tanner reported Mr. Hailstork's behavior to Mr. Godfrey, and Mr. Loving.

26.

Despite Ms. Tanner's complaint, there was no follow up and nothing was done to prevent Mr. Hailstork from sexually harassing Ms. Tanner at work.

6

27.

In or around October of 2014, Kevin Chancey, a manager in a separate department of the warehouse, began making sexual comments to Ms. Tanner and offering to pay for a sexual relationship on a near-daily basis.

28.

Mr. Chancey would also brush up against Ms. Tanner on a near-daily basis. Each time Mr. Chancey would touch or rub against Ms. Tanner, she would tell him to stop. Ms. Tanner always refused his advances and made it clear that his sexual propositions were unwelcomed and unwanted.

29.

In or around November 2014, Ms. Tanner reported Mr. Chancey's behavior to Mr. Loving, and Mr. Chancey ceased the harassment.

30.

In or around November 2014, Michael Byrd, an Associate, made sexually offensive comments to Ms. Tanner and showed her a video of himself masturbating.

31.

Ms. Tanner reported this incident immediately to Mr. Godfrey and Mr. Loving.

7

32.

Mr. Loving thought the video was funny and simply told Ms. Tanner to ignore Mr. Byrd.

33.

Despite her complaint, there was no follow up and nothing was done to prevent Mr. Byrd from sexually harassing Ms. Tanner at work.

34.

In or around January 2015, Mr. Chancey began sexually harassing Ms. Tanner again; however, the sexual harassment increased in intensity.  Mr. Chancey would grind his crotch against Ms. Tanner and would squeeze her buttocks.

35.

Ms. Tanner refused Mr. Chancey's advances and pleaded with him to stop.

36.

Again, Ms. Tanner reported Mr. Chancey's behavior to Mr. Loving. To the best of her knowledge, there was no follow up and nothing was done to prevent Mr. Chancey from sexually harassing her.

37.

In or around February 2015, Ms. Tanner made a verbal complaint of sexual harassment to Ms. Teresa Willis of the Human Resources Department.

8

38.

Ms. Willis directed Ms. Tanner not to speak to anyone about the harassment except with her and told Ms. Tanner to call or text her on her personal cell phone to report each incident of sexual harassment.

39.

Subsequently, Ms. Tanner would leave voice messages and text messages for Ms. Willis regarding the sexual harassment she was experiencing from the Harassers; however, there was no follow up and nothing was done to prevent the Harassers from sexually harassing her.

40.

Because nothing had been done to stop the Harassers' sexual harassment and advances, another trainer in the warehouse directed Ms. Tanner to call the head of Defendant Employer's Human Resources, Latoya Jones.

41.

Ms. Tanner called Ms. Jones and again, she was directed to report each incident of sexual harassment to Ms. Jones' personal cell phone.

42.

Ms. Jones informed Ms. Tanner there was going to be an investigation into her claims of sexual harassment, but to her knowledge, nothing was done to prevent the Harassers from sexually harassing her.

43.

In or around March 2015, Ms. Tanner contacted Ms. Deborah Coggins in the Human Resources Department and complained that Defendant Employer had still done nothing to follow up with or investigate her repeated complaints or intervened in any way to stop the sexual harassment from occurring.

44.

Later, Ms. Tanner asked Ms. Coggins and Ms. Willis for copies of her complaints of sexual harassment; however, she never received any copies of her complaints or any acknowledgement that any complaints had been filed on her behalf.

45.

Mr. Loving reassured Ms. Tanner he would say something about the sexual harassment, but reminded her that she was working in a warehouse, implying that being subjected to sexual harassment was the norm.

46.

Ms. Tanner spoke to Ms. Willis again about Mr. Chancey's behavior toward her and the continuing sexual harassment because Mr. Chancey was being physically sexually offensive.

10

47.

Ms. Willis claimed she had investigated Ms. Tanner's claims but was unable to substantiate her claims.

48.

On around September 2015, after 14 months of continued harassment, Ms. Tanner was constructively discharged from her employment with Defendant Employer.

49.

During this time, Ms. Tanner sought treatment from a psychologist about the sexual harassment she was experiencing at work. Ms. Tanner saw the psychologist a total of two times, but could not return due to dwindling finances.

50.

After Ms. Tanner was constructively discharged, she received a call from Ms. Coggins and Ms. Willis asking her to return to work.

51.

Ms. Tanner explained that she could not handle the continued sexual harassment from the Harassers at the workplace. It had been causing her mental anguish, anxiety, and had caused her blood pressure levels to rise.

52.

Ms. Willis told Ms. Tanner to take as much time as she needed and that she would reopen the investigation into her claims of sexual harassment. Ms. Willis also made assurances to Ms. Tanner there would no longer be any type of sexual harassment in the workplace.

53.

Prior to returning to work, Ms. Tanner was told to come in and sign a document to reflect that she had taken a personal leave during the time she had been out of the workplace.

54.

On or around October 2015, Ms. Tanner returned to work.

55.

Unsurprisingly, it was not long before the Harassers continued to sexually harass Ms. Tanner. During one particular incident Mr. Chancey groped her and called her a "bitch" for making a fuss.

56.

Ms. Tanner, again, reported and made complaints of sexual harassment to Ms. Coggins.

12

57.

Ms. Tanner would frequently speak to Ms. Coggins in her office and would cry about the treatment she received on a constant basis.

58.

In or around late October 2015, Ms. Tanner began experiencing chest pains and elevated blood pressure which required her to seek medical attention at the emergency room.

59.

Ms. Tanner sought medical treatment from her primary care physician to follow up on her chest pains and her elevated blood pressure, and he referred her to a specialist.

60.

While she was there, her primary care physician informed her she needed to have a partial hysterectomy to remove fibroids and cysts from her ovaries and uterus.

61.

In or around November 2015, Ms. Tanner sought medical attention for an irregular heartbeat that the specialist stated was related to the stress from her job.

62.

Ms. Tanner subsequently had an Exercise Stress Test at Atlanta Heart Associates, P.C. on or around November 25, 2015.

63.

Ms. Tanner was approved for FMLA leave for her surgical procedure and recovery.

64.

On or around December 4, 2015, Ms. Tanner underwent surgery and returned to work on or around January 25, 2016.

65.

On or around February 15, 2016, while Ms. Tanner was at work, she began hemorrhaging and bleeding through her clothes. Mr. Loving told Ms. Tanner to leave to the emergency room.

66.

While Ms. Tanner was en route to the emergency room, Mr. Loving called her and ordered her to return to the warehouse. Ms. Coggins had told Mr. Loving that Ms. Tanner would receive a half attendance point if she did not return. Concerned with her safety and well-being, Ms. Tanner went to the emergency room to get treated for the hemorrhaging.

67.

Ms. Tanner produced a doctor's note for leaving the job site on February 15 but was told by Ms. Coggins that she needed a note that covered three days to not be

penalized. Additionally, Ms. Tanner was told she needed a prescription from the doctor's visit to validate the excuse.

68.

Defendant had an attendance policy that required employees to obtain a doctor's note to cover three days of absences. If the doctor's note did not cover the entire three days, employees received a point demerit. If an employee accrues more than 5 points in a given period, the employee is terminated.

69.

On or around February 22, 2016, Ms. Tanner left work early to seek medical attention for stitches that had begun tearing prematurely. Despite producing a doctor's note, she received a half point.

70.

On or around February 24, 2016, Ms. Tanner requested to use accrued sick time on for the following day, and Mr. Loving approved her request. However, upon her return, she discovered she had been docked a point and Mr. Loving stated there was nothing he could do.

71.

On or around March 2, 2016, Ms. Tanner left work early attend a follow up Doctor's appointment and was docked a half point despite producing a doctor's note.

72.

Throughout this whole time, the Harassers continued sexually harassing Ms. Tanner and she continued to make complaints.

73.

In or around April of 2016, as a result of the investigation of Ms. Tanner's complaints of sexual harassment, Defendant terminated 6 managers and supervisors and 3 Associates, including Mr. Chancey, Mr. Cook, Mr. Carter, Mr. Hailstock, and Ms. Willis.

74.

After Mr. Chancey was terminated, Gene Perry, a manager in another department of the warehouse and Mr. Loving began retaliating against Ms. Tanner.

75.

Mr. Perry would follow Ms. Tanner around and wait for Ms. Tanner to make a mistake. For example, if there was litter on the floor, he would stop her while she was operating a forklift, make her get off, and pick up the litter. Mr. Perry was not as scrutinizing with any other associate.

76.

Ms. Tanner approached Ms. Coggins and Sabrina Swanson of the Human Resources Department, to complain about the retaliation she was experiencing, Ms.

16

Coggins and Ms. Swanson told Ms. Tanner they would not accept a written complaint, but advised that they would handle the situation.

77.

Despite Ms. Tanner's complaint, to the best of her knowledge, there was no follow up, no investigation conducted, and nothing was done to prevent Ms. Tanner from being subjected to retaliatory conduct.

78.

In or around April of 2016, she was written up by Mr. Perry, for not pulling a box according to company policy.

79.

However, Ms. Tanner had not pulled the box. Another Associate had incorrectly attempted to pull the box and left. Mr. Perry placed the blame on Ms. Tanner. Moreover, the box was unsafe to pull.

80.

Mr. Perry gave Ms. Tanner a demerit for the infraction. Ms. Tanner appealed the demerit point and showed a picture of the box to Thomas Watkins, Head of Safety and Ms. Swanson. Mr. Watkins and Ms. Swanson agreed that Ms. Tanner should not have been written up for pulling the box.

81.

However, Ms. Swanson did not dismiss the write up.

17

82.

On or around June 28, 2016, Ms. Tanner had accrued 5 hours of sick time and pursuant to company policy she requested to utilize that time.

83.

Ms. Tanner had spoken to Mr. Loving and requested approval to use the accrued sick time. Mr. Loving checked the database and verified that Ms. Tanner had accrued sick time and granted her request to leave and use that sick time.

84.

To make sure she definitely had accrued sick time left to cover a half day, Ms. Tanner also verified with another manager, J.C. Jones.

85.

When Ms. Tanner returned to work on June 29, 2016, she was told she had been given a half point for leaving early on June 28, 2016, despite having Mr. Loving approval and authorization.

86.

On or around June 29, 2016 Ms. Tanner was terminated for accumulating five attendance points.

18

87.

Despite being issued five attendance points, Ms. Tanner had doctor's notes and had been issued points for absences despite reassurances from her manager that she had been approved to take those dates without any repercussions.

88.

Ms. Tanner filed a Charge of Discrimination with the Equal Employment Opportunity Commission on July 8, 2016, a copy of which is attached hereto as Exhibit "A" and is incorporated herein.

89.

On March of 2017, the Equal Employment Opportunity Commission issued Ms. Tanner the Notice of Right to Sue, a copy of which is attached hereto as Exhibit "B" and is incorporated herein.

90.

This suit has commenced within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue.

**FIRST CAUSE OF ACTION: VIOLATION OF TITLE VII SEXUAL HARASSMENT**

91.

Plaintiff incorporates paragraphs 1-90 above, as if fully set forth herein.

92.

Ms. Tanner belongs to a protected group (female) as defined by Title VII.

19

93.

Ms. Tanner's supervisors and co-workers, engaged in the unwelcome sexual harassment of Ms. Tanner as described above.

94.

Ms. Tanner was harassed because of her gender.

95.

This unwelcome sexual harassment was sufficiently severe and/or pervasive as to alter the terms and conditions of Ms. Tanner's employment and/or to create a hostile and discriminatorily abusive working environment.

96.

Defendant Employer knew or should have known of the Harassers' sexual harassment of Ms. Tanner and failed to take prompt and appropriate remedial measures to stop the harassment.

97.

As a direct and proximate result of Defendant Employer's discriminatory conduct, Ms. Tanner suffered lost wages and benefits, significantly diminished employment opportunities, and emotional distress.

**SECOND CAUSE OF ACTION: TITLE VII UNLAWFUL RETALIATION**

98.

Plaintiff incorporates paragraphs 1-97 above, as if fully set forth herein.

20

99.

Ms. Tanner engaged in activities protected under Title VII of the Civil Rights Act of 1962, as amended, in opposing and reporting the sexual harassment and conduct during her employment with Defendant Employer.

100.

After Ms. Tanner's complaints, Ms. Tanner suffered adverse employment actions including but not limited to a hostile work environment and was retaliated against. Ultimately, Ms. Tanner was terminated from her employment with Defendant Employer for making complaints of sexual harassment.

101.

As a direct and proximate result of Defendant Employer's conduct towards Ms. Tanner, Ms. Tanner suffered lost wages, significantly diminished employment opportunities, and emotional distress.

**THIRD AND FOURTH CAUSES OF ACTION: ASSAULT AND BATTERY**

102.

Plaintiff incorporates by reference paragraphs 1 - 101, above, as if fully set forth herein.

21

103.

Ms. Tanner endured actions that led her to reasonably anticipate and fear that Mr. Chancey, among others, would engage in unwanted touching and sexual conduct toward her which was unwelcome and without consent.

104.

Mr. Chancey assaulted Ms. Tanner while conducting business for Defendant Employer.

105.

Mr. Chancey engaged in unwanted touching and sexually charged conduct toward Ms. Tanner that was offensive, unwelcome, and without consent.

106.

Mr. Chancey battered Ms. Tanner at the workplace controlled by Defendant Employer.

107.

Defendant Employer had actual and constructive knowledge of Mr. Chancey's misconduct and propensity for such misconduct. This foreknowledge of Mr. Chancey's proclivities combined with their failure to intercede on Ms. Tanner's behalf, after repeated complaints and requests for protection shows Defendant Employer condoned, adopted, and ratified Mr. Chancey's behavior.

## FIFTH AND SIXTH CAUSES OF ACTION: NEGLIGENT SUPERVISION AND NEGLIGENT RETENTION

108.

Plaintiff incorporates by reference paragraphs 1-107, above, as if fully set forth herein.

109.

The Harassers were sexually harassing Ms. Tanner, and Ms. Tanner made multiple complaints to Defendant Employer.

110.

Defendant Employer failed to take prompt and appropriate remedial steps to protect Ms. Tanner from the Harassers and Mr. Chancey's sexual assaults and batteries.

111.

Defendant Employer received multiple complaints of sexual harassment, assault, and battery from multiple employees. Despite employee complaints, Defendant Employer failed to monitor and protect Ms. Tanner from sexual harassment, assault, or from being battered by the Harassers.

112.

As a result of Defendant Employer negligent retention and negligent supervision of the Harassers, Ms. Tanner suffered damages in the form of lost wages

23

and benefits, significantly diminished employment opportunities, and emotional distress.

WHEREFORE, Plaintiff prays as follows:

(a)    that Summons issue;

(b)    that Defendants be served with Summons and Complaint;

(c)    that trial by jury of all issues be had;

(d)    that judgment be issued against Defendants for any and all general, special and where applicable, punitive damages as allowed by law under each and every count and cause of action contained in the Complaint;

(e)    for injunctive relief;

(f)    for all costs of this action to be taxed against Defendants;

(g)    for all costs and attorney's fees to be awarded to Plaintiff; and,

(h)    for any and all other further relief as this Court may deem just and equitable under the circumstances.

Respectfully submitted this 28th day of June 2017.

/s/ J. Stephen Mixon
J. Stephen Mixon
Georgia Bar No. 514050
steve@mixon-law.com
Gregory Y. Shin
Georgia Bar No. 446452
greg@mixon-law.com

24

Attorneys for Plaintiff

MILLAR & MIXON, LLC
1691 Phoenix Boulevard, Ste. 150
Atlanta, Georgia 30349
T: 770-955-0100
F: 678-999-5039

25